IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JULIETTE N. PATTERSON, | ) | CASE NO. 1:15CV796 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE DAN AARON POLSTER |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Juliette Patterson ("Patterson") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying her application for

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the

undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule

72.2(b)(1).

As set forth more fully below, the undersigned recommends that the Commissioner's

decision be **AFFIRMED**.

## I. Procedural History

On January 18, 2012, Patterson filed an application for DIB and SSI, alleging a disability

onset date of August 5, 2010.  Tr. 8, 196.  She alleged disability based on the following: Crohn's

disease, osteoporosis, stroke, and high blood pressure.  Tr. 228.  After denials by the state agency

initially (Tr. 93. 94) and on reconsideration (Tr. 123, 124), Patterson requested an administrative

hearing.  Tr. 142.  On March 7, 2013, Patterson's husband died and she filed an application for

1

disabled widow's benefits on March 19, 2013.  Tr. 205.  The Administration combined this claim

with Patterson's pending claims.  Tr. 8.  A hearing was held before Administrative Law Judge

("ALJ") Penny Loucas on November 6, 2013.  Tr. 26-63.  In her December 24, 2013, decision

(Tr. 8-20), the ALJ determined that Patterson can perform her past relevant work, i.e., she is not

disabled.  Tr. 36.  Patterson requested review of the ALJ's decision by the Appeals Council (Tr.

4) and, on February 26, 2015, the Appeals Council denied review, making the ALJ's decision the

final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A.  Personal and Vocational Evidence

Patterson was born in 1959 and was 52 years old on the date her application was filed.

Tr. 235.  She previously worked as a heat sealing machine operator, inspector, CNC grinder, and

cleaner.  Tr. 29-39, 52-55.  She attended college for one year.  Tr. 28.

### B.  Relevant Medical Evidence

 **Physical:** On March 18, 2010, an x-ray of Patterson's small bowel revealed a narrowing

of her terminal ileum, likely related to a stricture from Crohn's disease. Tr. 470.

On July 13, 2010, an x-ray of Patterson's lumbar spine showed mild disc space narrowing

and slight anterior listhesis at the L4-L5 level. Tr. 382.

On August 18, 2011, Patterson saw Nikolas Fouladpour, M.D., and complained of

abdominal pain and diarrhea.  Tr. 371-373.  Upon examination, her neck, back, abdomen,

extremities, and neurological signs were all normal.  Tr. 373.  Dr. Fouladpour noted that her

Crohn's "seems to be slightly less well controlled" and recommended she follow up with

gastroenterology ("GI").  Tr. 374.

On September 27, 2011, Patterson visited the emergency room complaining of lower abdominal pain for several weeks.  Tr. 357.  The pain was moderate and intermittent.  Tr. 357.  She reported 6-7 bowel movements per day.  Tr. 357.  She also complained of back pain.  Tr. 357.  She reported that she had not seen her GI "for a while."  Tr. 357.  Upon examination, Patterson had tenderness in her abdomen and normal exam findings in her back, extremities, and neurological signs.  Tr. 358.

On January 18, 2012, Patterson began seeing Mary K. Lane, M.D.  Tr. 328.  Patterson complained of occasional lower abdominal pain, intermittent achy pain in her lower back, and left shoulder pain.  Tr. 328.  Her physical exam findings were normal.  Tr. 330.

On January 31, 2012, a colonoscopy showed a rectal ulcer and inflammation. Tr. 480-481.

On February 8, 2012, Patterson, upon referral from Dr. Lane, saw physical therapist Elizabeth Musser for back and shoulder pain.  Tr. 321.  Musser observed Patterson had stretch weakness with posterior shoulder girdle muscles that contributed to poor posture and shoulder function and significant weakness grasping with her dominant, right hand.  Tr. 324.

On February 13, 2012, Patterson was on Prednisone for her Crohn's and was improving.  Tr. 314.  She denied pain, bleeding, and diarrhea.  Tr. 315.  Regarding her GI inflammation, the attending physician noted, "last [colonoscopy in 2012] likely due to missing meds."  Tr. 318.

On March 5, 2012, Musser noted Patterson had a positive straight leg raise test.  Tr. 311.  On March 26, 2012, Musser observed reduced shoulder movement and a negative straight leg raise test.  Tr. 307-308.

On June 11, 2012, Patterson reported to Jamile Wakim-Fleming, M.D., that she had four bowel movements a day.  Tr. 543.  Dr. Wakim-Fleming noted that Patterson's Crohn's flare-up improved when she restarted therapy.  Tr. 547.

On October 30, 2012, Patterson saw gastroenterologist John Maxwell, M.D.  Tr. 675-678. Dr. Maxwell recited her history with Crohn's, including her flare-up earlier that year.  Tr. 676. Patterson reported five bowel movements a day.  Tr. 676.  Dr. Maxwell commented that the follow-up sigmoidoscopy notes and Patterson's statements indicate that her symptoms had improved but not totally resolved.  Tr. 676.  Dr. Maxwell modified her medications, stating, "I think we should be able to do somewhat better."  Tr. 678.  He recommended she take 1-2 Imodium prior to leaving the house to "allow her to get out of the house more frequently and with less concern."  Tr. 678.  He recommended a follow-up visit in three months and stated, "I am not sure of the reasons for disability recommendations."

On March 4, 2013, Patterson saw Dr. Lane complaining of low back and left shoulder pain.  Tr. 683.  Her physical exam findings were unremarkable.  Tr. 684.  On March 22, 2013, she reported lower back pain that had worsened when her daughter fell into her a few weeks prior.  Tr. 694.  Her pain was worsened with activity.  Tr. 694.  Her lower lumbar spine and buttocks were tender to palpation and she had a decreased sensation in her left thumb; otherwise she had full, equal strength in her extremities.  Tr. 695.  An EMG of Patterson's left arm and hand was normal. Tr. 702-703.

On April 2, 2013, Patterson reported doing well.  Tr. 711.  She had three formed stools per day, very little cramping, no nausea, vomiting or chills.  Tr. 711.  She had returned to her baseline weight.  Tr. 711.

On July 23, 2013, Patterson reported to Dr. Lane that her back pain was unchanged and worse after she ran errands.  Tr. 729.  Her Flexeril was helping but she was not taking Tylenol or Motrin because she was concerned about side effects.  Tr. 729.

**Mental:** On April 13, 2010, Dr. Wakim-Fleming noted that Patterson was crying and easily frustrated, complaining that, after a visit to the emergency room, she was given too many medications and questioned whether they were good for her.  Tr. 384.

On August 18, 2011, Patterson reported to Dr. Fouladpour that she was stressed.  Tr. 371.

On January 8, 2012, Patterson complained to Dr. Lane of depressed mood, anxiety and stress related to her Crohn's diagnosis.  Tr. 328.  She was tearful and upset during her appointment and stated that she had support from her fiancé, "but otherwise has difficulty talking to family and friends about it."  Tr. 328.  Upon examination, Dr. Lane observed she had a depressed affect.  Tr. 330.  They discussed treatment including counseling and medications; Patterson said that she would think about it and come back.  Tr. 331.  Dr. Lane diagnosed Patterson with depression.  Tr. 331.

On June 11, 2012, Patterson saw Dr. Wakim-Fleming and denied depression and anxiety. Tr. 543.

On July 23, 2013, Patterson complained to Dr. Lane about increased stress the past several months, including that her children were having problems coping with the death of their father in March.  Tr. 729.  She reported caring for an elderly aunt out of state.  Tr. 729.  She reported support from her fiancé and mother.  Tr. 729.  Dr. Lane referred Patterson to counseling and prescribed Prozac.  Tr. 730.

**C.  Medical Opinion Evidence**

**1.  Treating Source Opinion**

On October 24, 2013, Dr. Lane completed a physical medical source statement on behalf of Patterson. Tr. 571-579. Dr. Lane opined that, due to back pain and disc space narrowing shown in her lumbar x-ray, Patterson could occasionally lift and carry up to 10 pounds. Tr. 571. Due to back pain, she could: occasionally push and pull; sit for 8 hours in 2-hour stints; stand for 2 hours in 1-hour stints; walk for 1 hour; never climb stairs, ramps, ladders and scaffolds; never kneel crouch or crawl; occasionally stoop; and frequently balance. Tr. 572-574. Dr. Lane found that, based on intermittent tingling in her left foot, Patterson could frequently use left foot controls. Tr. 573. Dr. Lane also opined that Patterson had environmental restrictions and could not operate heavy machinery or drive because of medication side effects. Tr. 575.

### 2. Consultative Examiner

On April 14, 2012, Patterson saw psychologist Herschel Pickholtz, Ed.D, for a consultative examination. Tr. 533-541. A friend brought her to the evaluation. Tr. 534. When asked why she could not work, Patterson answered, "pain, back problems, knee and ankle problems and Crohn's disease and Shingles." Tr. 534. She described her relationship with her children, parents, siblings, and fiancé as good. Tr. 534. She reported that her primary doctor diagnosed her with depression. Tr. 534. She reported one bout of depression and stated that she did not want treatment. Tr. 534. She also stated that she was not taking psychiatric medication and that, without medication, she experienced moderate depression three days a week. Tr. 537. She rated her ability to deal with work pressure and get along with coworkers and supervisors as average and reported experiencing no problems at work. Tr. 535-536.

Upon examination, Dr. Pickholtz described Patterson as normal with unremarkable behavior. Tr. 537. Her affect was normal and her mood appropriate. Tr. 537. Her thought content fell in the average range. Tr. 537. Dr. Pickholtz stated, "With future psychiatric

treatment, I believe the affective complaints would improve."  Tr. 537.  Patterson denied anxiety and Dr. Pickholtz did not observe any.  Tr. 537.  Her sensorium and cognitive functioning were generally in the average or below average range.  Tr. 538.

Patterson reported taking care of her hygiene and changing clothes daily.  Tr. 539.  She swept the floor four times a week, vacuumed and mopped once a month, shopped once a month, and cooked dinner four times a week.  Tr. 539.  She also made breakfast.  Tr. 539.  Every day she used her cell phone, watched television, and played cards.  Tr. 539.  She read magazines and Dr. Pickholtz described her ability to understand and remember television and written material as mildly impaired.  Tr. 539.  Patterson talked to her boyfriend on the phone and saw him three times a week; socialized with relatives once a week; and visited her mother twice a week.  Tr. 539.  She attended religious services three times a year.  Tr. 539.

Dr. Pickholtz diagnosed Patterson with adjustment disorder with depressed mood and depressive disorder, both mild to moderate.  Tr. 540.  He opined that Patterson was not seriously impaired in her ability to understand, remember, and carry out instructions for unskilled labor; slightly impaired in her ability to perform 1-3 step tasks; and somewhat impaired in her capacity to relate to coworkers and supervisors and handle work pressures.  Tr. 541.  He assigned a Global Assessment of Functioning ("GAF") score of 58.[1]  Tr. 541.

### 3.  State Agency Reviewers

**Physical:**  On June 1, 2012, state agency physician Michael Lehv, M.D., reviewed Patterson's file.  Tr. 71-73.  Regarding Patterson's physical residual functional capacity ("RFC"), Dr. Lehv opined that Patterson could lift up to 20 pounds occasionally and up to 10 pounds

---

[1]  GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: Diagnostic & Statistical Manual of Mental Health Disorders, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

frequently; could sit, stand and/or walk, with normal breaks, for about 6 hours in an 8-hour workday; and could climb ramps and stairs and push and pull without limits. Tr. 71-72.

On September 30, 2012, state agency physician Diane Manos, M.D., reviewed Patterson's file and affirmed Dr. Lehv's findings. Tr. 101-103.

**Mental:** On May 6, 2012, state agency reviewing psychologist Robyn Hoffman, Ph.D., reviewed Patterson's filed. Tr. 73-75. Dr. Hoffman opined that Patterson had moderate problems with social interactions and concentration, persistence, or pace; that she could perform a wide range of tasks that involve no fast pace or production quotas; and that she could superficially and infrequently interact with others. Tr. 74-75.

On October 4, 2012, state agency psychologist Deryck Richardson, Ph.D., reviewed Patterson's file and affirmed Dr. Hoffman's opinion. Tr. 104-105.

### D. Testimonial Evidence

#### 1. Patterson's Testimony

Patterson was represented by counsel and testified at the administrative hearing. Tr. 27-61. She discussed her past work with the ALJ. Tr. 29-39. When asked what prevents her from working, Patterson stated her Crohn's disease and her back pain. Tr. 41-42. Regarding her Crohn's, Patterson stated that, in a normal day, she will have three to four bowel movements. Tr. 42. Other times she has cramping. Tr. 42. If she feels good and tries to do things like clean her house, she suffers with back pain the next day. Tr. 42. She stated that if she has a good day with respect to her Crohn's, her back hurts, and if her back feels good, her Crohn's is bothering her. Tr. 42.

Patterson testified that she has not gone to church regularly in years because she is embarrassed to have to get up to go to the bathroom during church and she worries about the

smell. Tr. 43.  This happens when she is having a flare-up.  Tr. 45.  She says now she sits at the back of the church so it is easier to get up without interrupting people.  Tr. 44.  She only goes to the grocery store if she knows exactly what she wants—she "can't go in there and just do grocery shopping."  Tr. 46.  She no longer takes her grandchildren with her because they want to go up and down every aisle and she is unable to do that because it hurts.  Tr. 46.  She uses a cart to lean on, gets what she wants, and comes out again.  Tr. 46.

Patterson stated that she has flare-ups three or four times a week, "more often than not." Tr. 45.  Her flare-ups are worse as she gets older.  Tr. 41.  She has a bad day with her back every day.  Tr. 46.  When she has a good day with her back, she can sit for a while but then has to switch her position because she experiences numbness and throbbing.  Tr. 47.  Her Crohn's causes cramping also.  Tr. 49.

Patterson testified that it takes her four days to clean her house.  Tr. 47.  She cleans for one day, then rests the next day, then starts cleaning the day after.  Tr. 48.  It takes her all day, from 9:00 a.m. to 5:00 p.m. or 6:00 p.m.  Tr. 48.  She cleans one room at a time and by the time she is finished, she has to start over again because it has gotten dusty or dirty again.  Tr. 47.  She takes a lot of breaks when she is cleaning.  Tr. 48.  Her daughter helps her clean when she is home.  Tr. 47.  She stated that she receives help in general from her mother, father, boyfriend, daughter, and brother.  Tr. 50.  She feels that, eventually, people will get tired of helping her.  Tr. 50.

When asked whether she can perform her previous work, Patterson explained that she can no longer meet her quota putting metal parts on an assembly line because she would have to stop and go to the bathroom every fifteen or twenty minutes.  Tr. 49.  She stated that she sometimes

goes to the bathroom every fifteen minutes and that as soon as she washes her hands she may have to go again.  Tr. 49-50.

When asked about her depression, Patterson stated that her depression affects her ability to work as well.  Tr. 51.  She is not taking any medication.  Tr. 51.  She has talked to a therapist twice and she plans on seeing a psychiatrist.  Tr. 51.

### 2.  Vocational Expert's Testimony

Vocational Expert Mark Anderson ("VE") testified at the hearing.  Tr. 52-62.  The ALJ discussed with the VE Patterson's past work as a heat sealing machine operator, inspector, finisher, CNC grinder, crafter, and hospital cleaner.  Tr. 52-55.  The ALJ asked the VE to determine whether a hypothetical individual of Patterson's age, education and work experience could perform the work she performed in the past if that person had the following characteristics: can perform light work, is unlimited in climbing ramps and stairs and balancing, but can never climb ladders, ropes, or scaffolds; can occasionally stoop and frequently kneel, crouch, and crawl; and can occasionally reach overhead bilaterally.  Tr. 55-56.  The VE answered that such an individual could perform Patterson's past work as a sealing machine operator, crafter, inspector, finisher, and the grinder as Patterson performed it.  Tr. 56.

Next, the ALJ asked the VE if his answer would change if the individual had the same physical limitations but the following mental characteristics: can maintain concentration, persistence, and pace for two hour blocks of time over a normal eight hour workday and work week and can adjust to routine and expected changes in a workplace setting.  Tr. 56.  The VE stated that his answer would not change.  Tr. 56.

Patterson's attorney asked the VE whether a hypothetical individual could perform Patterson's past work if that individual had the following characteristics: can occasionally lift

and carry up to ten pounds and never anything more than that; can sit for eight hours out of an eight-hour workday but only two hours without interruption; can stand for two hours out of an eight-hour workday; can occasionally push and pull bilaterally; frequently operate foot pedals with the left foot; can never climb stairs and ramps, ladders, or scaffolds; can never kneel, crouch or crawl; can stoop occasionally and balance frequently; and can have no exposure to unprotected heights, moving mechanical parts, operating a motor vehicle, or vibrations. Tr. 57. The VE replied that, as Patterson performed the jobs of heat sealing machine operator and inspector, these jobs could be performed, but that the individual could not perform those jobs as described in the DOT. Tr. 57-58.

Patterson interjected that, with respect to the finishing job, she would have to walk to the end of the machine, retrieve a metal tub filled with parts, push the tub back to her workstation, and then take the parts out to work with them. Tr. 58. It took her a minute to walk to the end of the machine and she had to do this approximately every twenty minutes. Tr. 60-61. The VE testified that, given Patterson's description, the jobs of finisher, inspector, and heat sealing operator would still be available as jobs the hypothetical individual could perform. Tr. 61.

Finally, Patterson's attorney asked the VE how long an individual would have to be off-task during the workday and still be expected to maintain competitive employment. Tr. 62. The VE answered that an individual could be off task 10-15 percent of any hour and still meet production requirements. Tr. 62.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

11

can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

> 1.  If the claimant is doing substantial gainful activity, he is not disabled.
>
> 2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

---

[2] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her December 24, 2013, decision, the ALJ made the following findings:

1.  The claimant meets the insured status requirements of the Act through March 31, 2016.  Tr. 11.

2.  The claimant is the unmarried surviving divorced widow of Michael Patterson, who was insured at the time of his death on March 7, 2013. The claimant had attained the age of 50 prior to Mr. Patterson's death. Tr. 11.

3.  The prescribed period ends on February 28, 2019.  Tr. 11

4.  The claimant has not engaged in substantial gainful activity since August 5, 2010, the alleged onset date.  Tr. 11.

5.  The claimant has the following severe impairments: Crohn's disease and degenerative disc disease of the lumbar spine.  Tr. 11.

6.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 14.

7.  The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can only frequently kneel, crouch, or crawl, she can only occasionally stoop or reach overhead, and she can never climb ladders, ropes, or scaffolds. Tr. 15.

8.  The claimant is capable of performing past relevant work as a Heat Sealing Machine Operator, a Crafter, an Inspector, a Finisher, and a CNC Grinder.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.  Tr. 18.

---

C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

9.    The claimant has not been under a disability, as defined in the Act, from August 5, 2010, through the date of this decision.  Tr. 19.

## V. Parties' Arguments

Patterson objects to the ALJ's decision on three grounds.  She argues that the ALJ erred when she found that Patterson's mental limitations are not severe; the ALJ failed to properly evaluate the opinion of her treating source, Dr. Lane, and otherwise failed to provide good reasons for the weight she gave to Dr. Lane's opinion; and that the ALJ failed to account for Patterson's Crohn's disease in her RFC assessment.  Doc. 12, pp. 7-24.  In response, the Commissioner submits that substantial evidence supports the ALJ's determination that Patterson's mental impairment is not severe, her assessment of Dr. Lane's opinion, and her RFC assessment.  Doc. 15, pp. 6-14.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ did not err at Step Two when she found that Patterson's mental impairment is not severe

At Step Two, a claimant must show that she suffers from a severe medically determinable physical or mental impairment. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is not considered severe unless it significantly limits the claimant's physical or mental ability to do basic work activities. *Long v. Apfel*, 1 Fed. App'x 326, 331-332 (6th Cir. 2001); 20 C.F.R § 404.1521(a). "Basic work activities are defined as abilities and aptitudes necessary to do most jobs, and include: (1) physical functions; (2) the capacity to see, hear and speak; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with change in a routine work setting." *Simpson v. Comm'r Soc. Sec.*, 344 Fed. App'x 181, 190 (6th Cir. 2009) (quoting 20 C.F.R. §§ 404.1521(a)-(b) and 416.921(a)-(b))(internal quotation marks and alterations omitted)).

In *Higgs v. Bowen*, the Sixth Circuit reiterated, "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." 880 F.2d 860, 862 (6th Cir. 1988) (citing *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 90 (6th Cir. 1985)). The *Higgs* court observed that "this lenient interpretation of the severity requirement in part represents the courts' response to the Secretary's questionable practice in the early 1980s of using the step two regulation to deny meritorious claims without proper vocational analysis." *Id.* But the court also recognized that "Congress has approved the threshold dismissal of claims obviously lacking medical merit . . . ." *Id.* That is, "the severity requirement may still be employed as an administrative convenience to screen out claims that are 'totally groundless' solely from a medical standpoint." *Id.* at 863. The mere diagnosis of an ailment does not inform whether the impairment is severe. *Id.*

Here, the ALJ found that Patterson's alleged mental impairments, depression and anxiety, were not severe.  Tr. 12.  She explained,

> The claimant has not sought or received any specialist mental health treatment for these reported impairments.  At the hearing, the claimant reported that she had spoken with a therapist twice, but there are no therapy notes in the record to corroborate her testimony.  The claimant also testified that she has not taken any prescribed medications for depression or anxiety, although she received a prescription for Prozac and a referral to a psychologist from her primary care physician in July 2013.  In April 2012, Herschel Pickholtz, Ed.D., an independent consulting psychologist, interviewed the claimant at the request of the Ohio DDD and found sufficient clinical evidence to support a diagnosis for adjustment disorder with depressed mood.  Dr. Pickholtz' assessment is sufficient to show that the claimant has a medically determinable mood disorder.

Tr. 12.  The ALJ went on to evaluate Patterson's mental disorder under 20 C.F.R. §§ 404.1520a and § 416.920a and concluded that Patterson has only mild limitations in her activities of daily living, social functioning, and concentration, persistence or pace, and no episodes of decompensation.  Tr. 12.  The ALJ thus concluded that Patterson's mental disorder is not severe "unless there is compelling evidence that the disorder has significantly limited [her] ability to do basic work activities in some other way."  Tr. 12.  The ALJ found "no persuasive evidence" that Patterson experienced any more than mild limitations.  Tr. 12.  She remarked that Patterson herself does not believe that her symptoms require treatment; that she admitted to only experiencing symptoms at the end of the month coinciding with her monthly financial obligations; she denied memory problems, difficulty completing tasks, paying attention, and social problems; she testified that she stopped going to church because of her physical impairments, not her mental impairments; that she has been in a romantic relationship for over ten years and described it as a good relationship; she lives independently and can bathe, dress, and feed herself; she presented to Dr. Pickholtz as cooperative and otherwise unremarkable; she reported only mild problems to Dr. Pickholtz; she can shop, do chores, operate a cell phone; watch television, read magazines, and play cards; she frequently socializes with her boyfriend

and family members; and she has frequently and repeatedly denied depression and anxiety symptoms during medical appointments.  Tr. 13.

When discussing the medical opinion evidence later in her decision, the ALJ gave "some" weight to Dr. Pickholtz's opinion.  Tr. 17.  She explained that she credited his opinion that Patterson was not significantly impaired in her ability to understand, remember, and carry out instructions and perform one to two step tasks because it was consistent with the record as a whole; specifically, Patterson is independent and manages her daily affairs.  Tr. 17.  The ALJ did discredit Dr. Pickholtz's opinion that Patterson was somewhat impaired in her ability to relate to others and handle the pressure of work.  Tr. 17.  The ALJ accurately observed that Dr. Pickholtz's report indicated that Patterson told him she had no problems getting along with coworkers or supervisors, she had positive relationships with family members and a boyfriend, and she belonged to a church.  Tr. 17.  Thus, the ALJ noted, Dr. Pickholtz's opinion was inconsistent with his own report and other evidence in the record.  Tr. 17.  For the same reasons, the ALJ gave "little weight" to the state agency psychologists' opinions, which mimicked and relied upon Dr. Pickholtz's opinion.  Tr. 17.

Patterson argues that the ALJ committed error because she credited Patterson's own remarks over Dr. Pickholtz's opinion.  Doc. 12, p. 10.  She claims that she lacks insight into her own condition and her statements should not outweigh the opinions of medical health professionals.  Doc. 12, p. 10.  The undersigned disagrees.  Patterson repeatedly denied depression, anxiety, and other mental health impairments.  *See, e.g*., 543, 243 ("report of contact" note from the Agency documenting the following: Patterson denied memory problems, denied difficulty focusing or paying attention, has not seen a mental health professional, does not need to see a mental health professional, denied not being able to complete tasks due to mental

17

reasons and stated the reasons were due to physical pain, and asserted that she just gets worried at the end of the month whether she can afford her next month's medications).  Dr. Pickholtz described Patterson as "normal," having "no aberrant behavior," "affect appeared to be normal," "mood appeared to be appropriate," and "she is not experiencing any levels of anxiety."  Tr. 537-538.  Patterson recounted her daily activities (cooking, cleaning, playing cards, watching television, reading magazines, talking on the phone, visiting relatives and her boyfriend) and that she had no problems with others at work.  Tr. 536, 539.  She did not report being disciplined at work or terminated; instead, her jobs ceased because she was laid off, twice left jobs to take better jobs, and a company she was employed with moved.  Tr. 536.  She reported no problems in any of these jobs responding to work pressures, concentrating, or understanding and implementing her duties.  Tr. 536.  And yet, as the ALJ observed, Dr. Pickholtz opined that Patterson was somewhat impaired in her ability to relate to friends and relatives and handling the pressures of work.  Tr. 17.   The ALJ's determination to discredit this portion of Dr. Pickholtz's opinion because it was inconsistent with his own observations and Patterson's reports was well-reasoned, supported by substantial evidence, and not erroneous.  Nor was it error to give "little weight" to the state agency psychologists' opinions (which relying heavily upon Dr. Pickholtz's opinion) for the same reason; i.e., their opinions were inconsistent with the record as a whole, including Patterson's independent functioning and significant social relationships.  Tr. 17.  In sum, substantial evidence supports the ALJ's determination that Patterson's mental impairments do not significantly limit her ability to do basic work activities, *see* 20 C.F.R § 404.1521(a), and the ALJ's decision, therefore, must be upheld.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (a court must affirm the ALJ's decision if it is supported by substantial evidence).

**B.  The ALJ properly considered Dr. Lane's opinion**

Patterson argues that the opinion of her treating physician, Dr. Lane, was entitled to controlling weight.  Doc. 12, p. 13.  Even if Dr. Lane's opinion was not entitled to controlling weight, Patterson asserts, the ALJ failed to provide good reasons for discounting Dr. Lane's opinion.  Doc. 12, p. 18.

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2).  If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *Wilson*, 378 F.3d at 544.  In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole.  *See* 20 C.F.R. § 416.927(c); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

Here, the ALJ gave "little weight" to Dr. Lane's opinion.  Tr. 17.  She identified Dr. Lane as Patterson's primary care physician and set forth the limitations included in Dr. Lane's opinion, including that Patterson was able to lift and carry up to ten pounds occasionally, stand for two hours in an eight-hour day for one hour at a time, frequently operate left foot controls, and that she could not operate a motor vehicle, shop, travel without a companion, or walk at a reasonable pace on rough or uneven surfaces.  Tr. 17.  The ALJ explained,

> To support her assessment, Dr. Lane repeatedly refers to the claimant's subjective complaints of back pain when performing such activities, rather than to objective clinical or diagnostic evidence to support these extreme functional limitations.  Dr. Lane's treatment notes fail to supply the objective support Dr. Lane omitted from her opinion.  Lastly, Dr. Lane's opinion is inconsistent with the claimant's reported activities, which include attending regular church services outside her home, performing routine household chores, and shopping for necessities.  Dr. Lane's opinion carries little power to persuade.

Tr. 17.  *See also* Tr. 571-576 (Dr. Lane's opinion noting disc space narrowing in Patterson's lumbar spine as to why she is limited in lifting/carrying but citing back pain for other exertional and postural limitations).  The ALJ accurately characterized Dr. Lane's opinion as unsupported by objective clinical or diagnostic evidence and inconsistent with other substantial evidence in the record.[3]  Accordingly, The ALJ appropriately determined that she was not required to give Dr. Lane's opinion controlling weight.  *See Wilson*, 378 F.3d at 544 (a treating source opinion is entitled to controlling weight if the ALJ determines it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record.").

Moreover, the ALJ gave good reasons for assigning "little weight" to Dr. Lane's opinion.  The ALJ noted that Dr. Lane was Patterson's primary care physician and, elsewhere in her decision, pointed out that Patterson did not see an orthopedic specialist, a spine surgeon, or a chronic pain management specialist.  Tr. 17.  *See* 20 C.F.R. § 416.927(c)(5) (an ALJ considers the specialization of the physician).  She remarked that some physical examination findings in the record indicated slight weakness or limited range of motion in Patterson's upper extremities, but that the record contained ample evidence of negative straight leg raise testing, normal

---

[3]  Patterson argues that "back pain" is not based on Patterson's subjective reports of pain.  She asserts that Dr. Lane had access to Patterson's medical records from other providers and that "back pain" is supported by the record.  Doc. 12, pp. 14-15.  The undersigned notes that "back pain" is not objective clinical or diagnostic evidence.  Moreover, the record as a whole supports the ALJ's conclusion regarding Patterson's back pain, as is discussed more fully below.

reflexes, normal sensation, normal strength, and a full range of motion in all extremities and Patterson's spine.  Tr. 16.  20 C.F.R. § 416.927(c)(3),(4) (an ALJ considers the consistency and supportability of the opinion with the record as a whole).  She observed that Patterson's treatment has been largely conservative and that she responded well to treatment.  Tr. 16-17.  20 C.F.R. § 416.927(c)(2) (an ALJ considers the treatment provided).  She commented that Patterson only attended three physical therapy sessions, stopped attending when she developed shingles, and never returned to physical therapy.  Tr. 16.  Finally, the ALJ explained that a sigmoidoscopy revealed significant improvement of Patterson's sigmoid stricture related to her Crohn's disease in 2012 and that diagnostic studies of Patterson's arm showed no radiculopathy or other neuropathy.[4]  Tr. 16.  Thus, the ALJ complied with the regulations and gave good reasons for the weight she assigned to Dr. Lane's opinion.  Although Patterson identifies other evidence in the record that she argues supports Dr. Lane's opinion, there is substantial evidence in the record that supports the ALJ's decision and it must be affirmed.  *See Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) ("The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.").

Finally, Patterson argues that the ALJ erred because she gave "great weight" to the opinions of the state agency reviewing physicians despite the state agency reviewers not having access to Dr. Lane's medical opinion and certain other medical records, which were all submitted after their review.  Doc. 12, p. 19-20.  This argument is without merit because the ALJ did not rely solely on the state agency reviewers' opinions, as detailed above.  Moreover, "so long as an ALJ considers additional evidence occurring after a state agency physician's opinion, [s]he has

---

[4]  A sigmoid stricture is a narrowing of the sigmoid colon.  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1708, 1785.

not abused h[er] discretion." *Ruby v. Colvin*, 2015 WL 1000672, at *4 (S.D.Ohio March 5, 2015)

(citing *McGrew v. Comm'r of Soc. Sec.*, 343 Fed. App'x 26, 32 (6th Cir. 2009)).   The ALJ

considered all the evidence Patterson submitted; she committed no error with respect to her

treatment of Dr. Lane's opinion; and her decision must be affirmed.

### C.  The ALJ properly accounted for Patterson's Crohn's disease

Patterson argues that the ALJ's RFC assessment "lacks any signs of accommodation for

[her] severe impairment" of Crohn's disease.  Doc. 12, p. 20.  She criticizes the ALJ's finding—

that the record contains little objective evidence showing Patterson routinely experiences bowel

movements more frequently than three times daily when compliant with her medication—and

contends that the ALJ "fails to take into account the numerous medical records documenting Ms.

Patterson's difficulty with Crohn's disease and [her] testimony highlighting her struggles with

the disease."  Doc. 12, p. 21.

Patterson's argument fails.  Although there is evidence in the record "documenting her

continuing struggle with Crohn's disease," the ALJ considered this evidence.  She noted the

diagnostic testing Patterson underwent and the results of those tests.  Tr. 16.  She described

Patterson's conservative treatment, noted her Crohn's had been in remission since April 2013,

that there were few reported flare-ups in the record, and that, between flares, Patterson reported

up to three bowel movements a day, no diarrhea, and no rectal bleeding.  Tr. 16.  She noted that

the flare-ups appear to occur when Patterson is non-compliant with her medication.  Tr. 16.  The

ALJ also considered the comment from Dr. Maxwell, Patterson's gastroenterologist—"I am not

sure of the reasons for disability recommendations"—as indicative of the relative non-severity of

the limiting effects of Patterson's Crohn's disease.  Tr. 18.  The ALJ explained that she did not

find Patterson's allegations of the intensity, persistence and limiting effects of her symptoms

credible.  Tr. 15.  Accordingly, the ALJ accounted for Patterson's Crohn's-related abdominal pain when assessing Patterson's exertional and postural limitations in her RFC determination, and explained that Patterson did not need a further limitation for more workplace breaks because the evidence shows that, when compliant with treatment, Patterson does not need more than three breaks in an eight-hour day.  Tr. 18.  In sum, the ALJ accounted for Patterson's Crohn's disease in her RFC assessment, limited Patterson to the extent the ALJ found her disease limiting, explained why she did not provide further limitations, and her explanations are supported by the evidence.  The ALJ committed no error; her decision should be affirmed.

### VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: December 11, 2015

Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986)